MASON J. FOFT, Appellee, v. E. L. PAGE, Appellant.

No. 41575.

NOVEMBER 22, 1932.

Jepson, Struble & Sifford, for appellant.

Wormley & Wormley and Roseberry & Roseberry, for appellee.

BLISS, J.—This is a suit in equity brought by the vendor (appellee) for the specific performance of a contract to sell real estate. The issues are not as complicated as the facts. In August, 1930, Foft, the appellee, purchased by written contract from certain estate referees the quarter section of land in question. The contract called for settlement on March 1, 1931. The land was encumbered by a mortgage of $13,500, past due by its terms, and held by one Schulte. On October 3, 1930, Foft sold this land by written contract to Page, the appellant. The consideration was $20,000, of which $500 was paid in cash, and the balance of $19,500 to be paid March 1, 1931, at the office of Foft in Kingsley, Iowa, without interest until due, and at 8 per cent thereafter. Page had the right to pay the $19,500 at any time before March 1, 1931, and if he did, the amount of the mortgage was to be deducted, and Page was to receive 4 per cent interest until March 1, 1932, on the amount paid by him. The contract provided for punctual payment and performance on the part of the purchaser, and contained the customary forfeiture clause, and further provided that on performance by the purchaser, the seller would furnish abstract showing clear and perfect title, and would convey by warranty deed. Page knew that Foft held the land on contract, and he also knew of the mortgage encumbrance. A few days after executing the contract Page left for California. Foft had previously arranged with Schulte to extend the mortgage beyond March 1, 1931, at 5½%. Page told Foft, before leaving, that if the mortgage could be extended at 5% he would accept it. He asked Foft to find out from Schulte if the latter would do this. On November 11, 1930, Foft wrote Page that Schulte had arranged to loan the amount due on the mortgage on March 1, 1931, at 5½%, and

that the mortgage would have to be paid at that time. In this letter Foft said: "I was afraid he would not take the loan at 5 per cent. So I presume we will have to arrange to pay it March first. I thought you would want to know this in good time." Page did not reply to this letter, nor did he communicate with Foft until January 29, 1931, when he wrote him as follows:

"I have never heard from you anything further regarding the transfer of the land that we was dealing for, evidently it will not be transferred to me in time for me to secure a loan on the place before the mortgage on the place will become due, so you will have to arrange about taking care of that as owing to poor collections I will not be situated to pay more than ½ down and the balance I could assume. But if you do place a loan on it be sure the right to pay any amount of the mortgage that we may wish to pay at any interest paying date. If you have any doubt about their being able to give a satisfactory deed to the land by Mch. 1st please let me know."

Foft never answered this letter. On February 26, 1931, Page returned from California to Kingsley, the home of both parties. The following day he went out to the farm, where his son was making preparation to move on, and to care for twenty brood sows the father had purchased. Page observed that a portable granary had been removed since he contracted for the place. On the same day, February 27, according to Schulte and Faber, and March 2, according to Page, the appellant went to Remsen to see Schulte about the loan. According to Schulte, Page told him he couldn't get all of the money by March 1, and he wished to talk it over with Schulte about the loan, and whether he could loan it or not. Schulte told him he couldn't do anything without talking to Faber, who had arranged to use the money. Page and Schulte then went to see Faber, who told them his deal could wait fifteen days, if Page needed that much more time to procure a loan to close this March 1 land deal. Faber corroborates the testimony of Schulte. Page did not tell Schulte or Faber that he wanted until March 15 to get the money, as he had not seen Foft, and was going to see him the next day, February 28th. Foft was then in a hospital at Sioux City, where he had been since in December, 1930. Page testified that his only purpose in going to see Schulte and Faber was to find out if he

could borrow some money at 5%, and that he never asked for an extension of the loan.

On February 28, 1931, the last day of February, Page and one of his sons called on Foft at the hospital. Foft's version of this interview was that Page told him he came over to see "what arrangements we could make about closing the deal on March 1," as he would not have the money ready then, and that he would have to have a little time to make a loan on the land. Foft said he told him he would get in touch with Gates (a banker at Kingsley) and have him try to put a loan through for Page. He asked Page to have Gates call on him the next day at the hospital. With respect to the loan Foft said he told Page, "it would take about fifteen days to make this loan, as near as I could tell, and that there was no hurry on our part, we made arrangements there and could give him fifteen days' time if he wanted it." Foft said Page mentioned the absence of the granary and he told Page he might deduct $150 therefor from the purchase price, to which Page made no reply. Page and son denied the version of Foft, and testified that Page told Foft he was ready to settle for the premises and wanted possession, and asked if Foft was ready to deliver them; and Foft said he didn't have title, although he had an abstract, but it was too deep for him. Foft also asked him to call on Gates, and to have Gates call at the hospital. Page's son corroborated his father and said the latter had demanded a deed of Foft, which the latter said he did not have. Both said nothing was mentioned about getting time to make a loan. The evidence justifies a finding that Page was financially able to perform the contract on March 1. At that time he had a credit balance in the Kingsley bank of $6,724.79 and a cash balance in Long Beach, California, bank of $6,733.50, and had arranged with another Kingsley bank for from $6,000 to $10,000. He also owned an unencumbered 220-acre farm near Kingsley. Nothing was done by either party toward closing the transaction on March 1, which was Sunday, or on March 2. Gates called on Foft on Sunday, and on Monday, Gates had Baird, the manager of a loan company, inspect the farm. Before going to the farm Baird talked with Page, and agreed to and did meet Page on his return from the farm. Page told him he would have the place looking better in a year. Baird told him the maximum loan would be $7,000. Baird testified that Page was disappointed, as he expected to be able to borrow $10,000 on the place, to use in paying for the land. He

didn't sign an application, and said he would see Baird the following day. He stated that he had paid too much for the land, and that values had dropped, and he would like to get out of the deal, and was going to make a tender for the deed to Foft and force the contract through or give it up. Gates corroborates Baird, as do other witnesses relative to Page's dissatisfaction. Page does not deny the Baird testimony.

On March 3, Page called on Foft and asked if he had the deed and abstract ready, and receiving a negative answer, he personally delivered to Foft the following tender, in writing, prepared by his attorney, to wit:

"March 3, 1931

"Mr. Mason J. Foft, Sioux City, Iowa.
"Dear Sir:

"I hereby offer you the sum of $19,500 with interest thereon at six per cent from March 1, 1931, being the balance due on a certain contract dated October 3, 1930, whereby you agreed to sell me the Southwest Quarter (S. W. ¼) of Section Twenty-five (25), Township Ninety-one (91), Range Forty-four (44), Plymouth County, Iowa, and offer to surrender to you said land contract and now demand of you abstract of title showing clear and perfect title to the above described land and warranty deed executed by you, conveying full title to said real estate to me.

"Yours truly,
"E. L. Page."

On March 5, Page, by registered letter, received by Foft on the following day, notified Foft that because of his failure to perform the contract he had elected to terminate the same. He also demanded the return of the $500 paid, with interest at six per cent.

On March 7, Foft borrowed of the Gates bank $13,500 to pay the Schulte mortgage. The release of the mortgage was given the same day and recorded March 9. On March 7, Foft received from the referees a deed to these premises executed February 28, 1931, and recorded March 9. On March 9, Foft served on Page a written tender of deed and abstract, and a demand for $19,500. The tender recited that any defects in the abstract would be made good, and that if the offer was rejected, the deed and abstract would be left for acceptance at the office of Foft. The tender was refused.

On April 2, 1931, the appellee filed his petition, reciting many of the facts set out herein, averring his ability and readiness to per-

form, and asking judgment for $19,500 with 8% interest from March 1, 1931. Appellant's answer admits the contract, alleges the appellee's default in performance and the appellant's ability and readiness to perform and his tender of performance, and also alleges the loss of the granary. In a counterclaim appellant asks judgment for $500 with interest. Appellee's reply was a general denial, with reassertion of other matters already covered in this statement of facts.

The trial was begun on June 22, 1931. In the cross-examination of the witness Gates, it developed that his bank had taken from Foft a mortgage on the land in question, to secure the $13,500 loaned to Foft about March 7. At first the debt was unsecured, but as the closing of the transaction became further delayed, Gates became concerned lest the bank examiner would catch him without security for the notes, and between the 20th and 25th of March, Foft executed the mortgage to the bank. Although he testified that it was agreed that the mortgage was not to be recorded, and that he knew of Page's contract, and that the bank at no time claimed any rights under the mortgage superior to Page's rights in the land, yet the witness stated that the mortgage was taken to secure the money advanced and the bank was looking to the land as security, if the debt was not otherwise paid. He further testified that he was then willing that the land be deeded to Page free from the mortgage lien. On June 29, 1931, a satisfaction of a mortgage on this land, "dated and executed on the 6th day of April, 1931, and not of record," was executed by the Gates bank, and on the same day recorded. On the same day the appellee amended his petition, setting out the making of the release, and alleging that the plaintiff made no claim under the mortgage paramount to defendant's rights in the land, and tendered the release into court, that it might "make such order concerning the same as will equitably protect all of the parties hereto." The appellant amended his answer, alleging the execution of the mortgage of April 6, 1931, and that thereby plaintiff had elected to consider the land his own and to disregard the contract, and had estopped himself to ask for specific performance.

Appellant had objected to the abstract of title because a certain deed shown therein, dated July 25, 1892, purporting to have been executed by the grantors as heirs at law of the last preceding owner of record, did not recite that they were the sole heirs at law. On November 21, 1931, an affidavit curing this claimed defect was re-

corded in the recorder's office, and also filed in the clerk's office, in this cause. The abstract was last certified to March 9, 1931, and necessarily made no reference to the affidavit or the release of the unrecorded mortgage.

On January 23, 1932, the court granted decree for specific performance and judgment against appellant for $19,350, with interest at 8% from March 15, 1931, and denied appellant's counterclaim.

The first question for determination is whether the parties had agreed upon a modification of the contract with respect to the time and manner of its final consummation. Page was informed, by Foft's letter of November 11, 1930, that the mortgage of $13,500 would not be extended at 5% interest, and that if he desired the extension he would have to pay interest at $5\frac{1}{2}$%. The holder had already agreed with Foft to extend the mortgage at the latter rate. Page gave no indication to Foft, or to the holder, that he had changed his mind, and was willing to pay the higher rate. The holder then arranged with Faber to place the money at $5\frac{1}{2}$% after March first.

The first communication from Page to Foft was the former's letter of January 29, 1931, in which he informed Foft that he would not be able to perform the contract on March 1, according to its terms, and that, instead of paying the full amount of $19,500, he would be able to pay only half of it, and to assume a mortgage for the balance. Foft was not bound to accept any such partial performance. He did not reply to the letter, and heard nothing more from Page. The $13,500 mortgage had been due, by its terms, since March 1, 1923, and the maturity had been extended from year to year, apparently without any extension of record. The abstract had been continued to January 24, 1931, and then to February 28, 1931. Foft said he delivered the abstract to one of Page's sons about the middle of February for examination, but it was returned to him without examination, with the statement that the elder Page would attend to it on his return. The son denied this. There is no serious dispute as to what Page did on his return from California, and when what he thus did is viewed in the light of his letter of January 29, we have little hesitancy in finding that on February 28, Page asked for, and Foft consented to, a fifteen-day extension of the final performance of the contract. In view of this finding we must also find that Page's tender of March 3 and his notice of rescission of March 5 were such a violation of the modification agreement, and

such an abrupt change of front, that Foft could not be put in default thereby. Foft might have stood upon the modification agreement and have put himself in readiness to perform on March 15, but he elected to accept the repudiation thereof by Page, and prepared at once to place himself in position to perform. Under the circumstances he was entitled to a reasonable time in which to do so. He at once borrowed money of the Gates bank to pay the mortgage of $13,500. This was done, and a deed vesting title in him was procured on March 7, and both instruments were recorded on March 9, and the abstract was continued and certified to 9:30 o'clock in the forenoon of that day, showing the two instruments just mentioned. A written tender of the abstract and of a warranty deed from Foft to Page, and a demand of payment, together with a manual offer of the deed and abstract, the original contract, was made to Page on March 9, 1931. The tender, offer, and demand were refused.

If the record showed nothing further than this, we would have no hesitancy in affirming the trial court's decree. But a more troublesome question is yet to be answered. That question is: "What effect, if any, did the execution and delivery by Foft of the unrecorded mortgage to the Gates bank, the purpose thereof, the alleged rights, if any, claimed thereunder, and its release after the close of the evidence, but before decree, have upon the appellee's right to recover?"

Before answering this question, we will digress for a moment to briefly discuss some principles of law relative to the remedy of specific performance as they bear upon this case. As noted herein, Page, by the terms of the contract, was first obligated to pay, or to tender payment, before Foft was bound to tender deed and abstract. In other words the vendor, in a contract specifically requiring the vendee to first pay before getting deed, need only get himself in readiness to perform, and need make no tender until payment is made or offered by the vendee, and the vendor is not in default until this is done. We have so held in Huie v. Falde, 197 Iowa 289; Martin v. Work, 201 Iowa 444; Bortz v. Wright, 206 Iowa 698; Boynton v. Salinger, 147 Iowa 537. In the case last cited, suit was brought to foreclose such a contract, and the sufficiency of the petition was challenged because it did not allege the tender of the deed as a condition precedent to the maintenance of the action, nor tender such a deed. We there held that since the

vendors were under no obligation to convey until full payment, such allegations were not necessary.

In Huie v. Falde, supra, a suit for the specific performance of such a contract by the vendor, we said:

"We are of the opinion that appellee (plaintiff) could maintain the action for specific performance against the vendee without actually executing and tendering to the vendee a deed to the premises in controversy under this contract, and that, under the facts shown, appellant was in default, and the tender of deed in the petition and upon trial was sufficient."

In Winton v. Sherman, 20 Iowa 295, an action to foreclose such a contract, the defendant answered that the plaintiff had not tendered or delivered a deed. A demurrer to the answer was overruled. In reversing, this court said:

"But this rule does not obtain in equity causes, where the court, upon a final decree, can grant just such relief as the plaintiff may show himself entitled to, upon such conditions as shall fully protect the right of the defendants, not only as to the subject matter, but also as to costs. A delivery or tender of a deed, before bringing suit in equity for the purchase-money and foreclosure of lien therefor, or other equitable relief, is not necessary."

There was a like holding in a similar case, in Grimmell v. Warner, 21 Iowa 11. In fact, in the early case of Rutherford v. Haven & Co., 11 Iowa 587, such was held to be the rule in the foreclosure of a contract containing mutual and dependent covenants. The matter of "keeping a tender good" has been discussed in a number of cases, not only where specific performance was asked by the vendor, but also by the vendee. In actions of the latter kind the tender would necessarily be of payment. In equity actions of that nature, we have held that the money need not be paid into court, after a proper and adequate tender has once been made. In Martin v. Harper, 193 Iowa 259, the plaintiff tendered the money in sufficient amount, and evidenced the tender in writing; and again embodied in his petition an unconditional offer and tender of full performance on his part. We held it was not necessary to pay the money into court. Respecting a similar situation in Hayward v. Munger, 14 Iowa 516, we said:

"As to the failure to bring the money into court until after the

order was made by the referee, we remark, that it has been held under our statute, in an action at law, that the tender must be kept up; and that a plea of tender, unaccompanied by payment of the money into court, is of no avail. Johnson v. Triggs, 4 G. Greene, 97; Mohn v. Stoner, 11 Iowa 30; Freeman v. Fleming, 5 Id., 460. The rule is one of very questionable propriety, in view of the provisions of our statute, in a law action. It was so settled, however, as early as 1853, and we have not felt disposed to disturb it. In an equitable proceeding, however, we are unwilling to give it effect. The language of the statute is that, when the tender is not accepted, the party making it may, if he sees fit, retain it in his possession; but if afterwards the party to whom it was made see proper to accept it, and give notice thereof, the subject of the tender must be delivered within a reasonable time, or it will be of no effect. Section 1815. In this case respondents, at no stage of the case, intimated their readiness to accept the tender. At law, the judgment of the tribunal is either yea or nay; that it is either simply for or against the plaintiff or defendant. There is no power to so mould and shape the judgment as to make the rights of parties contingent upon the performance of certain things. In equity the whole matter is before the chancellor. He can direct that if the money is brought into court by a day named, the relief shall be granted; and if not, that it shall be denied; and can make all needful orders as to costs, if any should be adjudged against a party for his failure to keep his tender good, as it is termed. A court of law has no such power. And in view of the power possessed by the chancellor, and the provisions of our statute, we hold, that though the money was not brought into court, until directed by the referee, complainant should not, therefore, be denied relief—should not be turned out of court to come in again, with a case which, upon all its essential facts, shows that he has done equity, and has a right, therefore, to demand it. It is not unlike the distinction, which has been recognized by us, between a law and equitable action, in that class of cases where a deed is necessary to be tendered, by the terms of the contract, before there can be a recovery for the purchase money of the land. Though necessary at law, it is not in equity."

And so we inquire, in view of the decisions mentioned above, and the facts in this case, did the plaintiff fail in either the making or the maintaining of his tender? We may concede, at least for the purpose of argument, that, after appellant had made his offer to

pay and demand of deed on March 3, it was then incumbent on the appellee, within a reasonable time, to tender deed and abstract. He made a personal tender, adequately and properly, on March 9, and evidenced the same by a written tender wherein he promised to keep the same good. The tender having been refused, the appellee was rightfully entitled to commence his action. It was fully accrued. He had title to the land free of incumbrance, and he had tendered a warranty deed conveying the land to the appellant, and offered him an abstract of title showing that fact. At that time there was no unrecorded mortgage standing out against the property. There was then no good reason for the appellant's refusal to perform, and he therefore had no defense. And these facts distinguish this case from the case of Griffey v. Lubben, 196 Iowa 465. In that case the vendors had, on March 1, the very day on which the contract matured, given a mortgage on the premises, and a few days later had given another mortgage to another person, thus incapacitating themselves from making conveyance on that day free and clear of encumbrance. That was not true of the appellee in this case on March 9, as he was then in position to comply fully with his contract. Appellee filed his petition in this action on April 2, 1931. At that time the unrecorded mortgage to the Gates bank had not been given. Gates was not sure when it was given, and he thought it was between the 20th and 25th of March; but the satisfaction recites that it was of a mortgage given April 6, 1931, and appellant in the amendment to his answer alleged that to be the date of the mortgage, so that we must accept it as a fact. At the time of the commencement of the action the appellee was ready, able, and willing to perform the contract, and so alleged in his petition. There was no mortgage on the land at that time. In Nielson v. Benedict, 196 Iowa 173, that was not true, as the mortgage encumbrance complained of had been placed on the land by the mortgagor prior to the commencement thereof, but was released a few days before trial. The plaintiff in that case had also brought a quieting-title action in his own name. In both the Nielson and the Griffey cases we bottomed our ruling upon the fact that the vendors in each case had evidenced their intention of abandoning the contract and of asserting absolute ownership of the property. We find no such intent shown on the part of the appellee in this case. Everything shows the contrary intent. He at no time had put it out of his power to perform the contract. His every act showed his desire to consummate the contract.

The bank knew of Page's rights in the land when it took the mortgage; it conceded those rights to be superior at all times; and during the trial, and directly after the taking of evidence was concluded, executed and recorded a release of the mortgage. That the trial was not fully concluded is shown by the fact that each party filed further pleadings after the release was given. Where the plaintiff is a vendee, he need not at all times have his money in court ready to deliver, but he is required only to have it where it may be produced at such time as the court may order. As we said in Hayward v. Munger, supra:

"In equity the whole matter is before the chancellor. He can direct that if the money is brought into court by a day named, the relief shall be granted; and if not, that it shall be denied; * * *"

So in this case the appellee was not required to have his abstract certified from day to day. Also the court had full power to protect the rights of the appellant. It was not necessary for the court to do so, but it had the authority to have directed the appellee to produce a release of the mortgage at any specified time, on penalty of entering decree against him. The appellant was in no way injured by reason of this mortgage. Furthermore, his conduct in this matter has not been such as to make an emphatic tug at the heartstrings of a chancellor. In his letter of January 29, he asked the appellee to place such a mortgage on the land. He solicited the appellee's good offices in seeking to get a loan for him. By his conduct he forced the appellee into an unfavorable situation, and he ought not to be permitted to take advantage of a matter resulting directly from an exigency for which he was responsible.

Appellant complains also because the alleged defect in the title was not cured until after the trial and before the decree. There is no reversible error in this.

Other matters are urged upon us by appellant, but we find no good reason for interfering with the sound judicial discretion exercised by the trial court, and its decree is therefore—Affirmed.

STEVENS, C. J., and EVANS, ALBERT, and CLAUSSEN, JJ., concur. KINDIG, J., takes no part.